Signed and Filed: October 4, 2013

HANNAH L. BLUMENSTIEL
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No: 12-32859 HLB |
| SAN FRANCISCO MEDICAL ASSOCIATES, INC., | Chapter 11 |
| Debtor. | |

**MEMORANDUM DECISION AFTER TRIAL**

The above-captioned chapter 11 case came on for trial on July 23, 2013. Stephen D. Finestone appeared for San Francisco Medical Associates, Inc. (Debtor). Martha J. Simon appeared for objecting creditor Saxe Mortgage Company (Saxe). The Court hereby issues the following memorandum decision, which shall constitute its findings of fact and conclusions of law.[1]

**INTRODUCTION**

Debtor filed a petition for relief under Chapter 11 of Title 11 of the United States Code[2] on October 8, 2012. Debtor's primary asset is a commercial building, which is subject to a first deed of

---

[1] This memorandum decision shall constitute the Court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052.

[2] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code (11 U.S.C. §§ 101-1532) or the Federal Rules of Bankruptcy Procedure (Rules 1001-9037).

trust held by Saxe. The note secured by Saxe's deed of trust matured pre-petition and Debtor's chapter 11 plan seeks to extend the duration of the note and modify the essential terms of the note. Saxe objected to confirmation asserting that the proposed treatment of its claim under Debtor's chapter 11 plan is not fair and equitable pursuant to section 1129(b)(2)(A)(i).

**JURISDICTION**

This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This objection to confirmation action is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

**FACTS**

Debtor is the owner of real property located at 6301 Third Street, San Francisco, California (the "Property"). Dr. Arthur H. Coleman designed the Property in the early 1960's as medical offices to serve the Bayview District, an economically challenged area of San Francisco. The Property is a two-story structure with approximately 6,600 square feet of office space, and is comprised of 4 separate suites. Patricia Coleman, the daughter of Dr. Coleman, is Debtor's President and is responsible for its day-to-day operations.

Saxe receives funds from private investors and then loans those invested funds to borrowers. The loans are generally secured by a first deed of trust on real property of the borrower, and are usually interest-only. The duration of its loans vary from one to five years, although three years is most common. From the monthly payments, Saxe receives a 1% servicing fee and the remaining amount is distributed to the investors. Saxe does not guarantee any return to the investors, such that if a borrower defaults on a

payment the investors will not receive a distribution for that month.

On June 28, 2009, Debtor and Saxe executed a promissory note (the "Note") in the principal amount of $300,000 with interest of 13% per annum. Saxe calculated a 13% market-rate of interest based on the following risk factors: (a) the location of the Property in Bayview; (b) the fact that only 1/3 of the Property was leased to tenants; (c) Debtor's lack of income; and (d) Debtor's dubious creditworthiness. Debtor prepaid twelve months of interest and was required to make a balloon payment of $300,000 on July 1, 2010. The Note was secured by a first deed of trust on the Property and personally guaranteed by Patricia Coleman. Debtor used the proceeds from the Note to payoff a secured loan to Union Bank.

On July 12, 2010, at Debtor's request, Saxe agreed to extend the maturity date of the Note from July 1, 2010 to July 1, 2012. Other than the maturity date, all material terms of the Note remained the same, including the 13% interest rate. Debtor paid Saxe $6,000 (2% of the loan balance) as consideration for the two-year extension of the maturity date.

In March 2012, Debtor ceased making payments under the Note. Thereafter, Saxe commenced non-judicial foreclosure proceedings by recording a Notice of Default on April 18, 2012, and subsequently a Notice of Trustee Sale on July 26, 2012. The Trustee sale was originally scheduled for August 17, 2012.

On August 17, 2012, at Debtor's request, Saxe agreed to postpone the Trustee Sale contingent upon Debtor paying off the Note in full by September 17, 2012. Patricia Coleman personally paid Saxe $10,000 as consideration for this forbearance.

On September 17, 2012, at Debtor's request, Saxe agreed to postpone the Trustee Sale a second time contingent upon Debtor paying off the Note in full by October 9, 2012. Patricia Coleman personally paid Saxe $5,000 as consideration for this forbearance.

Prior to the expiration of the second forbearance period, Debtor and Saxe commenced negotiations regarding restructuring the Note. Initially, Saxe was reluctant to refinance the Note because Saxe believed Debtor to be a "difficult" borrower, but ultimately Saxe decided to offer Debtor an opportunity to refinance the Property with money from new investors. Saxe drafted new loan documents and presented them to Debtor for execution. However, Debtor decided not to execute the loan documents and instead sought relief in this Court.

Debtor's amended chapter 11 plan dated April 11, 2013 (the "Plan") proposes to pay Saxe monthly interest-only payments of $2,255.05 for 24 months, and to pay Saxe's claim in full through the sale or refinance of the Property within 24 months from the effective date. The calculation of the monthly payment is based on a principal balance of $350,000 and 6% interest (prime + 2.75% risk factor) with a 25-year amortization schedule. If Debtor defaults on any payment, Saxe shall provide Debtor with 10 days' written notice of the default, and if the default is not cured within 30 days, then Saxe is granted relief from the stay imposed by section 362 without further order of the Court.

Saxe objected to confirmation of the Plan and asserted three principal arguments. First, the proposed treatment of Saxe's claim is not fair and equitable pursuant to section 1129(b)(2)(A)(i). Second, the Plan was not proposed in good faith pursuant to section

MEMORANDUM DECISION -4-
Case: 12-32859    Doc# 103    Filed: 10/04/13    Entered: 10/07/13 10:24:32    Page 4 of 13

1129(a)(3). Third, an impaired class has not accepted the Plan, as required by section 1129(a)(10). The Court previously overruled Saxe's good faith objection, and Saxe's objection to the lack of an impaired assenting class became moot when the City and County of San Francisco was permitted to change its votes to accept the Plan. Accordingly, the only remaining objection is whether the proposed treatment of Saxe's claim is fair and equitable.

**ANALYSIS**

Section 1129(b)(1) allows for confirmation over a creditor's objection if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the plan, and has not accepted the plan." 11 U.S.C. § 1129(b). A plan is "fair and equitable" with respect to a secured creditor if among other things the secured creditor receives on account of its claim "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property." Id. at 1129(b)(2)(A)(i).

Both parties agree that, to determine whether the proposed interest rate on Saxe's claim complies with the requirements of section 1129(b)(2)(A)(i), the rate should be calculated using the formula approach articulated in the Supreme Court's plurality decision in Till v. SCS Credit Corp., 541 U.S. 465 (2004).[3] This formula approach requires the Court to determine, when an efficient

---

[3] Based on agreement of the parties, the Court will utilize the formula approach articulated in Till. The Court will leave for another day the determination of whether this formula approach is the appropriate standard to determine whether a proposed rate of interest complies with section 1129(b)(2)(A)(i) when the parties do not consent to the applicability of Till.

MEMORANDUM DECISION                -5-
Case: 12-32859    Doc# 103    Filed: 10/04/13    Entered: 10/07/13 10:24:32    Page 5 of 13

loan market for the debtor does not exist, the appropriate rate of interest by looking first to a base rate (in <u>Till</u>, the Court used the prime rate) that would be charged to a high-quality borrower. Then, the Court must add an appropriate risk adjustment to the base rate "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." <u>Till</u>, 541 U.S. at 479. Under <u>Till</u>, the Court starts from a "concededly low estimate" and then adjusts upwards for the situation-specific risks present. The evidentiary burden for establishing an appropriate interest rate under <u>Till</u> falls "squarely on the creditors." <u>Id.</u>

The appropriate risk adjustment is determined by considering factors including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." <u>Id.</u> Other risk adjustments include the: (1) probability of plan failure; (2) rate of collateral depreciation; (3) liquidity of the collateral market; (4) administrative expenses of enforcement; (5) location of the real property; (6) degree of deferred maintenance on the property; (7) number of unoccupied units; (8) amount of capital contribution to maintain the property; (9) proposed plan provision in the event of default; (10) debt service coverage ratio; (11) loan to value ratio; and (12) quality of any guarantors. See <u>Till</u> at 479; <u>In re Danny Thomas Prop. III Ltd. P'ship</u>, 231 B.R. 298, 301-02 (Bankr. E.D. Ark. 1999); <u>In re 20 Bayard Views, LLC</u>, 445 B.R. 83, 111-12 (Bankr. E.D.N.Y. 2011).

In <u>Till</u>, the Supreme Court noted that courts generally utilize a one to three percent risk adjustment when applying the formula approach. 541 U.S. at 480. Courts may, however, apply a significantly higher risk adjustment to reflect the particular

circumstances of the case. See In re Griswold Bldg., LLC, 420 B.R. 666, 696 (Bankr. E.D. Mich. 2009) (applying a 5% percent risk adjustment); In re Nw. Timberline Enters., Inc., 348 B.R. 412, 434 (Bankr. N.D. Tex. 2006) (applying a 5.75% risk adjustment).

Circumstances of the Estate. The circumstances of the estate are somewhat troubled. Unable to make the balloon payment required at the Note's original maturity date, Debtor was forced to request a two year extension of the maturity date. Prior to the extended maturity date, Debtor defaulted and Saxe commenced foreclosure proceedings. Debtor managed to fend off the Trustee Sale by negotiating two limited forbearance periods. Debtor chose not to agree to the terms Saxe proposed for restructuring the Note, instead seeking the protection of this Court to avoid foreclosure.

Debtor has not paid any post-petition property taxes, has cash reserves of just $2,000, and has failed to budget for ordinary course expenses such as water and trash or repairs and maintenance. These failures, along with Debtor's history in servicing the Saxe debt, raise grave concerns regarding the ability of Debtor's management to shepherd it through the Plan.

Nature of the Security. The City and County of San Francisco have a first priority lien on the Property for pre-petition property taxes of $13,635.31.[4] Saxe has a second priority lien on the Property. There are no other encumbrances on the Property.

Duration and Feasibility of the Plan. There are serious questions regarding the feasibility of the Plan. First, the linchpin of the Plan is Debtor's ability to sell or refinance the Property within 2 years from the effective date (15 days after

---

[4] Debtor is delinquent with all post-petition payments for property taxes and the amount of this secured claim is likely higher than the amount specified in the proof of claim.

entry of the order confirming plan). Debtor appears to have little interest in selling the Property, so refinancing the Property appears to be the only plausible option that would allow Debtor to consummate the Plan. It appears unlikely, however, that Debtor will be successful in refinancing the Property because Debtor seems unable to obtain financing. Since 2009, Debtor has attempted to refinance the Property without any success. Debtor's sole basis for believing that it can refinance the Property is based on the "cause" Debtor serves of providing medical facilities and services to the Bayview District. As honorable as this cause is, it has not been attractive enough to engage lenders interested in extending credit to the Debtor during the preceding four years, and the Court finds it unlikely that this cause will have any material impact on Debtor securing new financing during the next two years.

Second, as discussed below, the Plan does not require Debtor to make any capital contributions and the current rental income is insufficient to service the proposed debt payment to Saxe and pay all operating expenses for the Property.

<u>Probability of Plan Failure</u>. For the reasons stated above, there is a high probability that the Plan will fail.

<u>Location of the Property</u>. The Property is located in Bayview, an economically challenged area of San Francisco. The location of the Property was a risk factor that Saxe originally considered in calculating a 13% market-rate of interest.

<u>Number of Unoccupied Units</u>. The only tenant in the Property is Health and Environmental Research (HERC), which occupies 2 of 4 suites (approximately 50% of the rentable space), and pays monthly rent of $3,160. Debtor asserts that the remaining suites can be

MEMORANDUM DECISION -8-
Case: 12-32859  Doc# 103  Filed: 10/04/13  Entered: 10/07/13 10:24:32  Page 8 of 13

rented for approximately $3,800, but it has been unable to rent these suites for over three years. A high vacancy factor was a risk that Saxe originally considered in calculating a 13% market-rate of interest.

<u>Proposed Plan Provision in Event of Default</u>. The Plan provides that if Debtor defaults on any payment, Saxe shall provide Debtor with 10 days' written notice of the default, and if the default is not cured within 30 days, then Saxe is granted relief from the stay imposed by section 362 without further order of the Court.

<u>Debt Service Coverage Ratio (DSCR)</u>. Debtor is currently receiving monthly rental income from HERC of $3,160 and has monthly expenditures of: $2,255.05 (mortgage payment to Saxe), $425 (property taxes), $250 (property insurance), $200 (electricity), and unknown amounts for trash, water, repairs, and maintenance. On an annualized basis, the cash flows for the Property are:

| | |
|---|---|
| Gross Rent: | $37,920.00 |
| Property Taxes: | $ 5,100.00 |
| Property Insurance: | $ 3,000.00 |
| Electricity: | $ 2,400.00 |
| Water / Trash: | $ UNKNOWN |
| Repairs / Maintenance: | $ UNKNOWN |
| Total Operating Expenses: | $10,500.00 |
| Net Operating Income (NOI): | $27,420.00 |
| Total Debt Service: | $27,060.60 |
| Debt Service Coverage Ratio (DSCR): | 1.013 |

The debt service coverage ratio (DSCR) is a calculation of net operating income (NOI) divided by the total debt service. Under the proposed terms of the Plan, and based on all known expenses, the Property has a DSCR of 1.013 ($27,420 / $27,060.60). If all expenses for the Property were considered, including unknown expenses, the DSCR would be less than 1.0 and capital contributions

would be required to service the debt and maintain the Property. However, the Plan does not provide for any capital contributions and Debtor only has cash reserves of $2,000.

Loan to Value Ratio. The parties do not dispute that there is a substantial equity cushion in the Property. As of December 4, 2012, Saxe asserted in its motion for relief from stay that the total principal balance due under the Note was $345,468.52.[5] Debtor did not put forth evidence at trial regarding the total principal balance due under the note, but did assert in the Plan that the estimated balance due was $350,000. Saxe did not put forth any evidence at trial regarding the value of the Property, but did assert in its motion for relief from stay that the Property is worth $1,050,000. Debtor also asserts that the fair market value of the Property is $1,050,000, although it was advised by a broker that Debtor should list the Property for sale at $910,000. Accordingly, the Property has a loan-to-value ratio between 33% ($350,000 / $1,050,000) to 38% ($350,000 / $910,000).

Amount of Capital Contribution to Maintain Property. The Plan does not provide for any capital contributions for the two year period that Debtor will seek to either sell or refinance the Property. Rather, Debtor anticipates that monthly rental income will be sufficient to service the debt and pay the related expenses for maintenance of the Property. Debtor's assertion is not well

---

[5] Saxe did not file a proof of claim in this case, and did not put forth any evidence at trial regarding the current outstanding principal balance of the Note. Moreover, the Note does not provide for a default rate of interest, and without evidence regarding Saxe's actual damages as a result of Debtor's default, the Court cannot accurately calculate the current principal balance of the Note. The Court will assume, for purposes of this memorandum decision only, that the current principal balance of the Note is $350,000.

taken. The DSCR for the Property is 1.013 without factoring in such necessary expenses as trash, water, repairs, and maintenance. Although neither party has presented evidence regarding the amount of these expenses, the Court believes that conservative estimates for water and trash would be $200 per month and repairs and maintenance would be $875 per month (1% of fair market value of the Property / 12 months). Accordingly, Debtor would be required to make an annual capital contribution of at least $12,540.60 ($25,081.20 for the duration of the 2 year plan term) to maintain a DSCR of 1.0.[6]

Degree of Deferred Maintenance. Although neither party has presented evidence that Debtor has performed regular maintenance and repairs on the Property, there is likely some level of deferred maintenance, because the Property is over 50 years old, and because the DSCR for the Property is 1.013 without factoring in the estimated cost of repairs and maintenance.

Quality of Any Guarantors. Neither party presented evidence regarding the quality of the guarantor (Patricia Coleman); therefore, this factor neither weighs in favor of nor against confirmation.

Rate of Collateral Depreciation. Neither party presented evidence regarding the rate of depreciation for the Property, although Saxe presented evidence that the current real estate market in San Francisco is "hot" and that it is uncertain whether the market will depreciate over the next 2-4 years.

Liquidity of the Collateral Market. Neither party presented evidence regarding the liquidity of the collateral market, although

---

[6] To achieve an annualized DSCR of 1.00, the required capital contribution would be equal to the total debt service ($27,060.60) less net operating income ($14,520).

Saxe asserted that the Property could sell in the current real estate market for an amount in excess of the principal balance of the Note. As previously mentioned, Debtor appears to have little interest in selling the Property.

<u>Administrative Expenses of Enforcement</u>. Neither party presented any evidence regarding administrative expenses of enforcement.

After consideration of all the factors above, the Court determines that the proposed treatment of Saxe's claim is not fair and equitable under section 1129(b)(2)(A)(i). Although the loan-to-value ratio is relatively low (between 33-38%) and there is substantial equity in the Property, this factor alone does not mandate a low risk adjustment. The majority of other relevant factors support a higher risk adjustment. The Court determines that the particular circumstances of this case require a risk adjustment in excess of Debtor's proposed 2.75% to the prime rate of interest (3.25%), and the Court declines Debtor's invitation to determine which rate of interest (if any) would bring Debtor into compliance with section 1129(b)(2).

**CONCLUSION**

Confirmation of the Plan is denied because the proposed treatment of Saxe's claim is not fair and equitable under section 1129(b)(2)(A)(i). Saxe will be granted full relief from stay if Debtor does not confirm a plan on or before February 24, 2014.

**\*\*END OF MEMORANDUM DECISION\*\***

<u>**Court Service List**</u>

Patricia Coleman
6301 3rd Street
San Francisco, CA 94124